**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

In re:

C.D. JONES & COMPANY, INC.,                CASE NO.:  09-31595-KKS

                                           CHAPTER:  7

        Debtor.

_____/

## MEMORANDUM OPINION ON OBJECTION TO CLAIM OF 331 PARTNERS, LLC (Claim #48-1) (DOC. 201)

This case came before the Court for an evidentiary hearing on July 20, 2016, upon the Objection to Claim of 331 Partners, LLC (the "Objection," Doc. 201) filed by Thomas and Adele Daake (the "Daakes").

The Objection is based on a series of documents that originated with a promissory note that was non-recourse as to the Debtor unless the Debtor became a debtor in bankruptcy.  The gravamen of the Objection is that as a result of a prepetition settlement between the Debtor, the Claimant, 331 Partners, LLC ("331 Partners") and others, the Debtor's contingent liability to 331 Partners on account of that promissory note was eliminated, and the note became strictly *in rem*.  In response to the Objection, 331 Partners asserts that the settlement and corresponding loan modification documents reduced the principal balance on the promissory note but did not erase the Debtor's contingent liability to pay the note.

Both parties rely on the same documents for their diametrically opposed positions. The Daakes wish to bolster their argument with parol evidence in the form of deposition testimony of the Debtor's former principal, William Clay ("Mr. Clay"), given in 2012. 331 Partners objects to the admissibility of any parol evidence; Mr. Clay's 2012 deposition testimony, in particular.

The Parties

The Daakes are unsecured creditors. Their amended claim shows that the Debtor still owes them $4,778,603.03 on account of a final judgment based on a pre-petition jury verdict. They have been trying to collect on this judgment in a variety of forums since 2009.

331 Partners is also a creditor; its claim is based on a certain promissory note (the "Houses Note") and related documents. Its original claim, the one subject to the Objection, is in the total amount of $9,184,765.38, with $7,500,000 listed as secured and $1,684,765.38 listed as unsecured.[1]

If the Objection is sustained, 331 Partners will have no unsecured claim and the Daakes' claim will comprise approximately 80% of unsecured claims eligible to

---

[1] In 2005, 331 Partners sold property to the Debtor and took back two promissory notes, the "Houses Note" and the "Lot Sales Note." 331 Partners did not file a claim on account of the "Lot Sales Note." 331 Partners has since filed an amended claim in which the full amount is listed as unsecured; the Daakes have objected to the amended claim as well.

2

share in a distribution.  At last report, the Trustee was holding approximately $330,000.00.

Procedural History

331 Partners filed the claim objected to (Claim 48-1) on December 4, 2009. The Daakes filed the Objection on December 4, 2012.  In 2013 the Daakes filed a motion for summary judgment on the Objection.  331 Partners opposed that motion but did not file a cross-motion for summary judgment.  The Daakes' summary judgment motion was denied in July of 2013, after which the Objection remained dormant until March of 2015, when it was set for status conference.[2]

The Facts Surrounding the "Houses Note"<br/>and Workout Documents

Mr. Clay formed 331 Partners in or around June 2004.  Shortly thereafter, 331 Partners purchased land in Sandestin, Florida for approximately $14 million. The land would later be known as Villa Lago.  On November 3, 2005, 331 Partners sold Villa Lago to C.D. Jones & Company, Inc. (the "Debtor") for $49,915.857.00. The Debtor paid the purchase price by way of (a) $17,800,000.00 in cash, (b) a promissory note in the amount of $16,759,475.00 (the "Lot Sales Note"), and (c) a promissory note in the principal amount of $15,356,382.00 (the "Houses Note").[3]

---

[2] Docs. 275, 297, 303, 422.
[3] The history of the Houses Note is set forth in the parties' Joint Stipulation of Undisputed Facts, Doc. 655.

Both notes were executed on November 3, 2005. The Lot Sales Note was secured by a mortgage on the remaining lots in Villa Lago. The Houses Note was secured by a collateral assignment of building contracts between the Debtor and lot purchasers. Only the Houses Note is at issue here.

The purpose of the Houses Note was to enable the Debtor to construct and sell new homes on lots within Villa Lago, repay that portion of the Villa Lago purchase price and make a profit. On the original Houses Note, interest was due and payable quarterly beginning December 31, 2005, and continuing until September 30, 2009; principal was to be paid, at least in part, from the Debtor's receipt of construction progress payments on new homes being built for lot buyers; the maturity date was December 31, 2009.[4] Article 16 of the original Houses Note, entitled "Exculpation," made the loan non-recourse as to the Debtor (the Debtor "shall be liable upon the debt to the full extent (but only to the extent) of the security therefore") unless certain events occurred, including the Debtor filing a voluntary bankruptcy petition. The pertinent portion of Article 16 provides:

> ALL OF THE DEBT SHALL BE DEEMED FULLY RECOURSE TO PURCHASER [the Debtor], AND THE GUARANTORS SHALL ADDITIONALLY BE DIRECTLY AND PRIMARILY LIABLE, ON A JOINT AND SEVERAL BASIS, FOR THE ENTIRE DEBT IN THE EVENT THAT (A) PURCHASER FILES A VOLUNTARY PETITION PURSUANT TO FEDERAL BANKRUPTCY LAW, ….[5]

---

[4] Claim 48-1, part 3; Daakes' Exhibit 4; Joint Stipulation of Undisputed Facts, Doc. 655.

[5] Filing bankruptcy was one of seven events that would render the obligation fully recourse. Unlike certain ipso facto clauses found in executory contracts that are unenforceable pursuant to 11 U.S.C. § 365(e), this type of ipso facto clause, or "bad boy" guaranty, is enforceable. *See U.S. Bank, Nat. Ass'n v. Kobernick*,

The Debtor and 331 Partners modified the Houses Note three times. The May 1, 2006 modification acknowledged the balance due and added Mr. Clay as a guarantor. The December 29, 2006 modification acknowledged the amount due from the Debtor and the liability of the guarantors, and extended the due date of the December 31, 2006 interest payment to January 31, 2007. The April 3, 2007 modification reiterated the amount due as $15,356,382.00, modified the repayment terms, extended the maturity from December 31, 2009 to December 31, 2010, and released Christopher R. Jones as a guarantor.[6]

The April 3, 2007 modification specifically stated: "nothing contained herein shall ... impair nor release any covenant, condition or agreement in said note … which, as modified by this Agreement shall continue in full force and effect in accordance with their [SIC] original terms."[7] The April 3, 2007 modification also provided: "Lender [331 Partners] retains, as liable on the debt evidenced by the Note, the Borrower [the Debtor] and Clay, who shall not be released from the Assignment and Note by reason of this Agreement."[8] Also on April 3, 2007 the Debtor and 331

---

454 Fed. Appx. 307, 313 (5th Cir. 2011); *F.D.I.C. v. Prince George Corp.*, 58 F.3d 1041, 1046-47 (4th Cir. 1995). The Daakes do not argue that the ipso facto clause contained in Article 16 of the original Houses Note was unenforceable; rather, they argue that this clause was written out of the Houses Note by virtue of the Loan Workout Agreement , and that it was the intent of the parties that the loan would remain purely non-recourse.

[6] That modification stated that Dennis and Cynthia Jones had previously been released as guarantors on the note.

[7] Claim 48-1, part 6; Daakes' Exhibit 5.

[8] *Id.*

Partners executed a Collateral Assignment Modification Agreement in which they again acknowledged the full amount due on the modified Houses Note.[9]

On February 1, 2008, 331 Partners declared the Debtor in default under the Houses Note as modified through April 3, 2007. Thereafter, the Debtor, 331 Partners and guarantors agreed to settle their disputes. They executed a document entitled "Loan Workout Agreement and Release Among C-D Jones & Company, Inc., William F. Clay, and 331 Partners, LLC" (the "Loan Workout Agreement").[10] This Loan Workout Agreement, negotiated between Mr. Clay on behalf of the Debtor and McGowin Patrick on behalf of 331 Partners,[11] provided for the Debtor to complete the Villa Lago amenities, convey certain lots to 331 Partners in lieu of foreclosure on account of the Lot Sales Note, and for settlement of third party litigation. The Loan Workout Agreement states that in exchange for certain releases, 331 Partners "shall credit [the Debtor] under the Houses Note such that the remaining principal balance as of the Effective Date of this Agreement is $7,000,000.00."[12] The next sentence in that agreement provides: "[The Debtor] shall continue to be obligated to Lender under the Houses Note as to the remaining Collateral Documents and will perform [the Debtor's] obligations under said

---

[9] That document contained language similar to that set forth in the April 3, 2007 Houses Note modification. (Claim 48-1, part 8.)
[10] Claim 48-2, part 10; Daakes' Exhibit 7; 331 Partners' Exhibit 2.
[11] Trial testimony of Mr. Clay.
[12] Claim 48-2, part 10, page 3; Daakes' Exhibit 7; 331 Partners' Exhibit 2.

remaining Collateral Documents …."[13]  On April 30, 2009, the same date as the Loan Workout Agreement, the Debtor, 331 Partners and others entered into an agreement entitled "Mutual Release and Covenant Not to Sue" (the "Mutual Release").[14]  The April 30, 2009 documents shall be collectively referred to as the "Workout Documents."

The Workout Documents released Mr. Clay from his personal guaranty of the Houses Note and any obligation to indemnify 331 Partners and others.[15]  The Workout Documents also released the Debtor and others from claims and liabilities "except for those obligations set forth in either the Loan Workout Agreement or the LLC Agreement …."[16]

The Objection

One of the bases for the Objection, that the Houses Note was merely an agreement to share profit, was overruled long ago.  In a contested matter between the Daakes and 331 Partners in the Chapter 11 case of 331 Partners the bankruptcy court for the Southern District of Alabama ruled:

> In this case, there is no contract between 331 Partners and C–D Jones to engage in a joint venture, there is no joint right of control, no right to share in the profits, and no duty to share in any losses. The evidence shows that 331 Partners and C–D Jones had a structured loan repayment

---

[13] The term "Houses Note" is a defined term in the Loan Workout Agreement.
[14] Claim 48-2, part 11; Daakes' Exhibit 8; 331 Partners' Exhibit 3.
[15] *Id*. at 1.
[16] The parties have raised no issues pertaining to the LLC Agreement in connection with the Objection.

plan that, although based on lot sales, did not constitute loss or profit sharing.[17]

The remaining basis for the Objection, that an "understanding" between the Debtor and 331 Partners rendered the Houses Note strictly *in rem*, or uncollectable unless the Debtor built homes, is also overruled.


## Discussion

The issues boil down to (1) whether the Workout Documents, standing alone, can be read and understood without other evidence; (2) if not, whether parol evidence should be admitted to determine whether the Workout Documents released the Debtor from contingent *in personam* liability to 331 Partners on the remaining balance of the Houses Note; (3) if parol evidence should be admitted, which such evidence is most persuasive; and (4) whether 331 Partners has a monetary claim or whether the Objection should be sustained.

The Daakes and 331 Partners each insist that the documents are clear and unambiguous. 331 Partners asserts that the drafters of the Workout Documents were "almost surgical in their choice of words" and that nothing in those documents changed the nature of the Debtor's obligations under the Houses Note. The Daakes argue that the Workout Documents rendered the Debtor's obligations to 331 Partners

---

[17] *In re 331 Partners,* 2010 WL 4676621, *7 (Bankr. S.D. Ala. November 9, 2010), *aff'd.* 2011 WL 3440099 (S.D. Ala. August 8, 2011).

under the Houses Note purely non-recourse, especially considering testimony given by Mr. Clay in 2012 in connection with an unrelated dispute.

A review of the documents themselves is, of course, essential. The threshold issue is whether the Workout Documents are ambiguous. Where a contract, read as a whole, is clear, complete and unambiguous on its face, the contract will be enforced according to its terms.[18]

### The Workout Documents

A review of the original Houses Note, as modified, and the Workout Documents themselves reveals that no additional evidence is necessary or required to determine the meaning of the documents.

The Workout Documents became effective before the Debtor filed bankruptcy. At that time, the Debtor's liability remained non-recourse because none of the seven events had occurred to trigger *in personam* liability under the ipso facto clause in Article 16 of the Houses Note.[19]   The Loan Workout Agreement refers to the Debtor's obligations under the Houses Note several times:

a. Recital "C." describes the "security for the Houses Note;"

b. Recital "E." sets forth the parties' goal of settling their disputes "with respect to the obligations under the … Houses Note."

---

[18] *In re Prime Motor Inns, Inc.,* 167 B.R. 261, 279 (Bankr. S.D. Fla. 1994) (interpreting contracts governed by New York law).

[19] Doc. 275, ¶ 26.  The Daakes acknowledged that in prior versions of the Houses Note "the filing of a bankruptcy by CD Jones would have converted any non-recourse obligation into a recourse obligation."

c.  Section 4 of the Loan Workout Agreement authorized the Debtor to release certain lot purchasers from their obligations to purchase lots in exchange for a credit sufficient to reduce the principal due on the Houses Note from $15 million to $7 million.  Section 4 also reaffirmed the Debtor's obligations with respect to the remaining, non-released and future lot sale contracts;

d.  Section 6 of the Loan Workout Agreement provides that if the Debtor became a debtor in bankruptcy, "the rights of [331 Partners] against [the Debtor] under the Houses Note …, including all rights of enforcement," would not be subject to the automatic stay.

In their motion for summary judgment the Daakes argued that Sections 6, 7.2 and 7.3 of the Loan Workout Agreement eliminated the ipso facto provision in the Houses Note that rendered the Debtor's payment obligation fully recourse in the event of bankruptcy.  That is not an accurate interpretation of those Sections, which constitute fairly routine provisions of a loan workout agreement.   Section 6 exempted 331 Partners from the automatic stay in the event of the Debtor's bankruptcy. Section 7.2 stated that the Workout Documents were in complete satisfaction of the parties' disputes.  Section 7.3 is a standard non-merger provision:

> Merger of Prior Agreements.  This Agreement contains the entire agreement of the parties hereto and supersedes any prior written or oral agreement between them concerning the subject matter hereof.

The "entire agreement of the parties" to which Section 7.3 refers necessarily encompasses all matters dealt with in the settlement, specifically including the Houses Note. The Houses Note contains the ipso facto clause that made the Debtor liable for the money due on the note if it ended up in bankruptcy. Because the Loan Workout Agreement refers to the Houses Note and the provisions of Sections 6 and 7.3 are not in conflict with the note, those sections did not eliminate the Debtor's contingent liability under the Houses Note.

At the hearing the Daakes focused on certain language in Section 4 of the Loan Workout Agreement, immediately following the portion that reduced the principal balance on the Houses Note to $7 million, where it is stated:

> CD Jones shall continue to be obligated to Lender [331 Partners] under the Houses Note as to the remaining Collateral Documents and will perform CD Jones' obligations under said remaining Collateral Documents, ...[20]

Section 1.4 of the Mutual Release contains similar language. It states, in part, that: "331 Partners does not release CD Jones under the Houses Note to the extent of the remaining House Construction Contracts as contemplated in Section 4 of the Loan Workout Agreement . . . ." [21]   The Daakes argue that this language rendered the Debtor obligated to pay on the Houses Note only if it built homes in Villa Lago.

---

[20] The Houses Note was accompanied by an "Assignment of Purchase Documents" that, among other things, assigned to 331 Partners as collateral building contracts between the Debtor and lot purchasers. The building contracts were defined as the "Collateral Documents." Doc. 655.
[21] Claim 48-2, part 11, page 3; Daakes' Exhibit 8; 331 Partners' Exhibit 3.

The Daakes also argue that Sections 1.2, 1.3 and 1.4 of the Mutual Release clearly operated to release any contingent *in personam* liability of the Debtor to 331 Partners.

Reading these Sections in context does not support such an interpretation. The Workout Documents addressed two types of obligations that the Debtor had to 331 Partners: payment and performance. The payment obligation required the Debtor to make principal and interest payments according to a certain schedule, and rendered the Debtor personally liable for all sums due on the note upon the Debtor's filing of its bankruptcy petition. The performance obligation required the Debtor to complete the infrastructure in Villa Lago, sell lots and build houses. While Sections 1.2, 1.3 and 1.4 of the Mutual Release dealt with both obligations by requiring the Debtor to dedicate certain proceeds from home construction to repayment of the principal due on the Houses Note, they did not eliminate the Debtor's contingent *in personam* payment obligation.

Section 1.1 of the Mutual Release released Mr. Clay as a guarantor; it also released Mr. Clay and the Debtor from obligations to indemnify 331 Partners and others against various claims.[22] These releases do not equate to a release of the Debtor from recourse liability on the Houses Note in the event it became a debtor in bankruptcy.

---

[22] *Id.*

12

Section 1.2 of the Mutual Release references the guaranty and indemnity releases in Section 1.1.  It then provides that 331 Partners released the Debtor "except for those obligations set forth in … the Loan Workout Agreement ***and*** except as set forth in Section 1.4, below, …" (emphasis added).  The Loan Workout Agreement reduced the principal on the Houses Note to $7 million, and otherwise made no changes to the Houses Note.  The "except for" in Section 1.2 did not operate to release the Debtor from its payment obligations on the Houses Note; it did the exact opposite: it excepted the $7 million Houses Note payment obligation from any release.

Section 1.4 of the Mutual Release refers to the Debtor's performance obligations.  That Section clarified that 331 Partners was not releasing the Debtor from liability to pay principal on the Houses Note out of any house construction contracts that were not released via the settlement.  Nothing in Section 1.4 alone, or in Sections 1.1, 1.2 and 1.4 taken together, amounts to a complete release of the Debtor from its (then contingent) *in personam* liability under the Houses Note.

<u>Legal Discussion - Contract Interpretation</u>

The interpretation of a written contract is a matter of law to be determined by the court.[23]  Only where the terms of a contract are ambiguous are there issues

---

[23] *Fabrica Italiana Lavorazione Materie Organiche, S.A.S. v. Kaiser Aluminum & Chemical Corp.,* 684 F.2d 776, 780 (11th Cir. 1982);  *see also, DEC Elec., Inc. v. Raphael Constr. Corp.,* 558 So. 2d 427, 428 (Fla. 1990).

of fact and the court should then resort to outside evidence to construe the contract.[24] In determining whether a contract is ambiguous the words should be given their natural, ordinary meaning.[25]

Under Florida law, "[c]ontract interpretation begins with a review of the plain language of the agreement because the contract language is the best evidence of the parties' intent at the time of the execution of the contract."[26] In construing a contract, the court must determine the intention of the parties from an examination of the entire contract.[27] When a transaction is comprised of more than one document, the court may read the documents together in order to determine the meaning and intent of the parties; this is commonly known as the composite document rule.[28]

When the Workout Documents in this case are read together, they paint a picture of parties who agreed to 1) reduce the principal amount due on the Houses

---

[24] *Key v. Allstate Ins. Co.,* 90 F.3d 1546, 1549 (11th Cir. 1996); *Neumann v. Brigman,* 475 So. 2d 1247, 1249 (Fla. 2d DCA 1985).

[25] *Key,* 90 F.3d at 1549.

[26] *Taylor v. Taylor,* 1 So. 3d 348, 350 (Fla. 1st DCA 2009).

[27] *USAmeribank v. Klepal,* 100 So. 3d 56, 60 (Fla. 2d DCA 2011); *Robins v. Walter,* 670 So. 2d 971, 974 (Fla. 1st DCA 1995); *see also Lowe v. Winter Park Condo. Ltd. P'ship,* 66 So.3d 1019, 1021 (Fla. 5th DCA 2011)("[t]he rule of construction relating to contractual terms requires courts to read provisions of a contract harmoniously in order to give effect to all portions thereof.").

[28] *See Bender v. James (In re Hintze),* 525 B.R. 780, 788 (Bankr. N.D. Fla. 2015) ("[U]nder certain circumstances multiple documents may be combined to create a valid security interest under the composite document rule . . .")); *see also Clayton v. Howard Johnson Franchise Sys., Inc.,* 954 F.2d 645, 648 (11th Cir. 1992) ("Under Florida law, where two or more documents are executed by the same parties, at or near the same time and concerning the same transaction or subject matter, the documents are generally construed together as a single contract.")

Note from $15 million to $7 million in exchange for certain considerations, including releases of third parties; 2) require the Debtor to perform by completing the infrastructure for Villa Lago and constructing homes; and 3) change the repayment terms for both principal and interest.[29]  Reading all of the paragraphs and Sections together, and applying the composite document rule, it is clear that 331 Partners released the Debtor from certain specific liabilities, but not from its obligation to repay the full balance due on the Houses Note if it became a debtor in bankruptcy.

The Workout Documents are not ambiguous.  They did not release the Debtor from its contingent recourse liability in the event it filed a voluntary bankruptcy petition.  The assertion that Section 1.2 of the Mutual Release gave the Debtor a "broad sweeping and virtually limitless release of all claims"[30] is simply not correct.

<u>Legal Discussion - Parol Evidence</u>

Only upon a finding that the Workout Documents are ambiguous would parol evidence be admissible.  Ambiguous is defined as "able to be understood in more than one way: having more than one possible meaning."[31]   Here, the Daakes and

---

[29] It is also reasonable to assume that the reduction of principal from $15 million to $7 million was at least in part to offer the Debtor incentive to perform its other obligations, specifically including finishing its work on the Villa Lago Property, in order to begin selling lots and homes so both 331 Partners and the Debtor could finally begin making the money anticipated when they entered into these transactions to begin with.

[30] Doc. 275, page 8.

[31] http://www.merriam-webster.com/dictionary/ambiguous.

331 Partners reach exact opposite conclusions based on the same language. Assuming that both parties are reasonably interpreting the documents,[32] an analysis of the parol evidence rule, and the parol evidence the Daakes seek to introduce, is appropriate.

The general rule is that a verbal agreement or other extrinsic evidence, commonly known as "parol evidence," cannot be used "to contradict, vary, defeat, or modify a complete and unambiguous written instrument, or to charge, add to, or subtract from it, or affect its construction."[33]   Parol evidence *is* admissible when needed to explain the meaning of ambiguous documents and to assist the court in determining the meaning of contractual language where ambiguities exist as to the parties' intent.

> Where the language of a contract is ambiguous, parol evidence is admissible to aid in its interpretation. *Burger King Corp. v. Horn* & *Hardart Co.,* 893 F.2d 525, 527 (2d Cir.1990). A contract is ambiguous "where a natural and reasonable reading of its language allows for two or more possible meanings." *Roberts v. Consolidated Rail Corp.,* 893 F.2d 21, 24 (2d Cir.1989); *Curry Road Ltd.,* 893 F.2d at 511. In such cases, the courts may look to the surrounding facts and circumstances to determine the intent of the parties. *Roberts,* 893 F.2d at 24.[34]

---

[32] *Prime Homes, Inc. v. Pine Lake, LLC*, 84 So. 3d 1147, 1151 (Fla. 4th DCA 2012) ("Ambiguities exist when a document can reasonably be interpreted as having more than one meaning.").
[33] *J.M. Montgomery Roofing Co. v. Fred Howland, Inc.*, 98 So. 2d 484, 485-86 (Fla. 1957) (*citing* 13 Fla.Jur., Sec. 383, pp. 380-381).
[34] *In re Prime Motor Inns, Inc.,* 167 B.R. 261, 279 (Bankr. S.D. Fla. 1994).

Florida courts ordinarily allow parol evidence where there is a latent ambiguity and reject it where there is a patent ambiguity.[35]  "When a contract is rendered ambiguous by some collateral matter, it has a latent ambiguity, and the court must hear parol evidence to interpret the writing properly."[36]  A latent ambiguity arises where the contract language is clear and suggests a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings.[37]  In contrast, a patent ambiguity is an ambiguity appearing on the face of the document.[38]

At least one Florida court has recognized a third category, known as an intermediate ambiguity, which should be treated as a latent ambiguity permitting admission of extrinsic evidence.[39]  In *Ace Electric Supply Co.* the court was asked to interpret a guaranty that described the amounts for which the guarantors would be liable as: "Purchases . . . authorized by the undersigned [guarantors] only."[40]  There were two "undersigned" guarantors, but only one authorized any purchases. The seller of goods sued both guarantors.  The language on the face of the guaranty was clear, but the issue was one of intent: whether the other guarantor was liable when

---

[35] *Landis v. Mears*, 329 So. 2d 323, 325-26 (Fla. 2d DCA 1976).

[36] *Mac-Gray Servs., Inc. v. Savannah Assocs. of Sarasota, LLC*, 915 So. 2d 657, 659 (Fla. 2d DCA 2005) (quoting *RX Solutions, Inc. v. Express Pharmacy Servs., Inc.*, 746 So. 2d 475, 476 (Fla. 2d DCA 1999)).

[37] *Id.*  (quoting *Ace Elec. Supply Co. v. Terra Nova Elec., Inc.*, 288 So. 2d 544, 547 (Fla 1st DCA 1974)).

[38] *Id.*

[39] *Ace Elec.Supply Co. v. Terra Nova Elec., Inc.,* 288 So. 2d 544, 547 (Fla. 1st DCA 1974).

[40] *Id.* at 546.

he had not authorized any purchases.  The court admitted parol evidence, holding that the ambiguity was latent.  The most critical evidence was the parties' declarations of intent prior to or at the time of execution of the instrument.[41]  Citing to an opinion by the Florida Supreme Court, the court in *Ace Electric* stated:

> [W]here the terms of a written contract are in any respect uncertain or doubtful and the parties thereto have by their conduct placed a construction upon the contract which is reasonable, such construction will be adopted by the court upon the principal that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the principles of correct legal interpretation of the terms of the contract.[42]

## The Evidence

In evidence are all of the documents that make up 331 Partners' claim.  At trial, Mr. Clay testified live and 331 Partners introduced deposition testimony of McGowin Patrick given on July 31, 2015.[43]  Over 331 Partners' objection, the Daakes offered Mr. Clay's 2012 deposition in evidence; they used portions of that deposition testimony in the direct examination of Mr. Clay.[44]

The Daakes urge that the most compelling parol evidence is Mr. Clay's 2012 deposition testimony.  They argue that because 2012 was closer in time to the

---

[41] *Id*. at 544-48.

[42] *Orlando Orange Groves Co. v. Hale*, 119 Fla. 159, 161 So. 284, 295 (Fla. 1935) (other citations omitted, including several Fifth Circuit rulings interpreting Florida law).

[43] Docs. 653; 656.

[44] *See,* Doc. 201-2.

creation of the Workout Documents than the other testimony offered it reflects the

freshest recollection of the Debtor's and 331 Partners' intent.[45]   331 Partners urges

that Mr. Patrick's 2015 deposition testimony is most compelling.   Neither party is

correct.   Rather, if parol evidence is to be admitted the best evidence is how 331

Partners and the Debtor treated the "Houses Note" obligations immediately after

they created the Workout Documents.   The record in this case shows that the Debtor

and 331 Partners consistently treated the Houses Note as a monetary obligation.

The Workout Documents were effective as of April 30, 2009.   The Debtor

filed Chapter 7 about 90 days later, on July 30, 2009.   At that time 331 Partners still

had two claims against the Debtor:   one based on the Lot Sales Note and the other

based on the Houses Note.   The Debtor filed its bankruptcy Schedules with its

Chapter 7 petition; Mr. Clay signed the Schedules on behalf of the Debtor.   On

Schedule D the Debtor listed its two debts to 331 Partners.   It listed the Houses Note

debt in the amount of $15,000,000.00, and described it as "Contract Claim" secured

by "Promissory Note and Mortgage on Builders contracts for unbuilt homes." The

Debtor listed the value of the collateral for the Houses Note at $0 and the unsecured

---

[45] 331 Partners was not present or represented during Mr. Clay's deposition, taken on November 13, 2012 in a different Adversary Proceeding (Daake v. Jones, Case No.: 11-03045), nor did it receive notice of that deposition.   For that reason alone, that deposition testimony should not be admitted.   Fed. R. Bankr. P. 7032(a)(1)(A).   Mr. Clay was also deposed in 2010 in the 331 Partners' Chapter 11 case (ALSB Case No. 10-00846-MAM), but neither party produced or sought to use Mr. Clay's 2010 testimony.

portion of the claim as $15 million.[46]  About fourteen days later, on August 13, 2009,

331 Partners filed a motion for relief from stay seeking to continue a foreclosure

action as to the Lot Sales Note.  In that motion, among other things 331 Partners

alleged that the Debtor was in default by "failing to pay 331 Partners those amounts

due under the Houses Note."[47]  In support of its stay relief motion 331 Partners filed

an affidavit of McGowin Patrick.[48]  In that affidavit, Mr. Patrick swore that the

"Debtor failed and refused to pay to 331 Partners the amounts due under the Houses

Note on January 15, 2008, or upon any subsequent date, …."[49]  Mr. Patrick also

swore in this affidavit that 331 Partners had previously declared "and does again

declare to be due and payable the full amount of the outstanding indebtedness under

the terms of the Lot Sales Note and the Houses Note …."[50]

On December 4, 2009, within eight months of the effective date of the

Workout Documents, 331 Partners filed the claim that is the subject of the

Objection.[51]  Attachment A to the claim reflects that the claim amounts were

calculated based on the $7,000,000.00 principal remaining due on the Houses Note

pursuant to the Workout Documents, plus interest and attorney's fees.[52]

---

[46] Doc. No. 1, p. 15.  The Debtor's second listing of a claim of 331 Partners was for the Lot Sales Note obligation.

[47] Doc. 9, ¶ 10.

[48] At that time Mr. Patrick was President of IPC Industries, Inc., which in turn was Manager of 331 Partners.

[49] Doc. 18, ¶ 10.

[50] Id. ¶ 13.

[51] Claim 48-1.

[52] 331 Partners has since filed an amended claim showing the entire amount due to be unsecured.  (Claim 48-2, filed January 16, 2015.)

Notwithstanding that the Debtor and 331 Partners treated the Houses Note as a monetary debt within a year after its creation, the Daakes argue that Mr. Clay's 2012 testimony should prevail as proof that the Debtor had no payment obligation to 331 Partners upon the filing of the petition. While admitting in the Objection that 331 Partners lowered the principal balance owed on the Houses Note to $7,000,000, the Daakes assert that "it was the *understanding of the parties"* that if the Debtor could no longer build houses then it did not have an obligation to pay on the Houses Note.[53] While this may have been true when the Workout Documents were signed, it did not remain true when the Debtor filed its Chapter 7 petition. On that date the Debtor's contingent liability to pay the Houses Note became an absolute liability.

Even if Mr. Clay's 2012 testimony were admitted, it does not support the Objection. Even in the face of his 2012 testimony on direct examination, Mr. Clay testified that the Houses Note "never went away," and that only the repayment terms were changed via the Workout Documents. This testimony is not inconsistent with Mr. Clay's 2012 deposition testimony, and is entirely consistent with how 331 Partners and the Debtor treated the Houses Note debt as of the bankruptcy and afterwards.[54] Mr. Clay's trial testimony was credible; his explanation of his 2012 testimony was believable.

---

[53] Doc. 201, ¶¶ 9, 10, citing to Mr. Clay's November 13, 2012 deposition (emphasis added).

[54] Counsel for the Daakes read from Mr. Clay's 2012 deposition during direct examination of Mr. Clay: "I was able to renegotiate so that C.D. Jones got a fixed amount of money for building a house and I believe it's 150 a square foot, and there was also a fixed fee which would allow C.D. Jones to make -- actually have

<u>CONCLUSION</u>

The documents speak for themselves and are not ambiguous.  The Debtor acknowledged its contingent liability for the principal due to 331 Partners in every iteration of the Houses Note, beginning with the Original Note that stated in Article 16:  "ALL OF THE DEBT SHALL BE DEEMED FULLY RECOURSE TO [the Debtor] … IN THE EVENT THAT (A) [THE DEBTOR] FILES A VOLUNTARY PETITION PURSUANT TO FEDERAL BANKRTUPCY LAW …."  That provision was not negated by the Workout Documents. The Objection cites no language in the Workout Documents that amounts to a blanket release of the Debtor's contingent payment liability on the Houses Note.  331 Partners' release of guarantors in the Workout Documents is consistent with the conclusion that the Debtor's contingent liability to pay the Houses Note remained in place.

Even if the Court had found the Workout Documents to be ambiguous, and even if parol evidence were admitted, including Mr. Clay's 2012 testimony, the weight of the evidence shows that beginning when the Debtor filed its Chapter 7 petition in 2009, both the Debtor and 331 Partners treated the Houses Note as a recourse obligation.

---

and make money on building houses." (Doc. 660, Trial Tr. 41:2-6)  Mr. Clay was then asked by counsel for the Daakes: "In exchange for that, was C-D Jones *then* not obligated to pay under the house note?" (Emphasis added.) Mr. Clay's answer: "That's correct. Much better deal for C-D Jones." (Doc. 660, Trial Tr. 41:7-10)  This was testimony about the effect of the Workout Documents on the Debtor as of the date those documents were executed.  This testimony had nothing to do with what happened to the 331 Partners claim when the Debtor filed bankruptcy three months later.

For all of the reasons stated, the Objection to Claim 48-1 will be overruled.

The Court will enter a separate order consistent with this opinion.

DONE AND ORDERED on _____August 25, 2016_____.


_____
Karen K. Specie
United States Bankruptcy Judge

Copies to all parties in interest.